**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **DEBORAH ANN SWEITZER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil No.   12-cv-602-CJP** |
| | ) | |
| **COMMISSIONER of SOCIAL SECURITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Deborah Ann Sweitzer is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).[1]

## Procedural History

Ms. Sweitzer applied for benefits in April, 2009, alleging disability beginning on March 1, 2008.  (Tr. 21).   The application was denied initially and on reconsideration.   After holding a hearing, ALJ Martha R. Reeves denied the application for benefits in a decision dated December 16, 2010.  (Tr. 21-35).   Plaintiff's request for review was denied by the Appeals Council, and the decision of the ALJ became the final agency decision.   (Tr.10).

Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1]  This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).   See, Doc. 21.

1

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1.   The ALJ's findings were inconsistent with the testimony of the Vocational Expert (VE).

2.   The ALJ failed to ask whether the VE's testimony was consistent with the *Dictionary of Occupational Titles.*

3.   More weight should have been given to the physical Residual Functional Capacity (RFC) evaluation done by a state agency consultant.

4.   The ALJ should have considered plaintiff's neuropathy.

5.   The ALJ failed to consider plaintiff's GAF scores.

6.   More weight should have been given to the opinion of plaintiff's therapist, Christina Helm (formerly known as Christina Hutchinson).

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   **42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   **42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C).**

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   **20 C.F.R. §§ 404.1572**.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, **649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**.   Thus, this Court must determine not

whether Ms. Sweitzer was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   **See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995))**.

This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   ***Richardson v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.   ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**.   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.   See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010),** and cases cited therein.

### The Decision of the ALJ

ALJ Reeves followed the five-step analytical framework described above.   She determined that Ms. Sweitzer had not been engaged in substantial gainful activity since the alleged onset date, and that she had severe impairments of bipolar disorder, borderline personality disorder, perforated diverticulitis status post colostomy, and obesity.   She determined that plaintiff's impairments do not meet or equal a listed impairment

The ALJ found that Ms. Sweitzer had the residual functional capacity to perform work at the sedentary to medium exertional levels with limitations arising from her mental impairments.   She was limited to simple work instructions, a job with close supervision and reminders of her

instructions once an hour, and with no contact with the general public.   Based on evidence from a vocational expert, the ALJ found that plaintiff does not have the capacity to perform her past relevant work.   However, she could do other jobs which exist in the national economy, such as call-out operator and finish inspector.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff.

**1.      Agency Forms**

Plaintiff was born in 1976, and was almost 32 years old when she allegedly became disabled.   (Tr. 185).   She was 5'4" tall and weighed 230 pounds.   (Tr. 190).   She had attended one year of college.   (Tr. 200).

In a Disability Report, plaintiff said she was unable to work because of depression, anxiety, panic attacks and bipolar disease.   She said that she had surgery "for internal problems" which created more mental problems, and that she had a hard time controlling her emotions and dealing with everyday affairs.   She said that she stopped working on March 1, 2008, because her bipolar disease was very bad and she was pregnant.   (Tr. 191).   She was last insured for DIB as of December 31, 2012.   (Tr. 186).

Ms. Sweitzer had previously done clerical work and had worked as a manager and assistant manager in retail stores.   (Tr. 192).

Plaintiff lived with her husband and young daughter.   She said that she fed, bathed and changed her daughter about half the time.   She was limited in what she could do around the house

because she could not bend.   She said she had difficulty concentrating and she was extremely

irritable.   She also claimed difficulty with memory, completing tasks, understanding, following

instructions and getting along with others.   (Tr. 225).

## 2.    Evidentiary Hearing

Plaintiff was represented by counsel at the hearing on December 7, 2010.   (Tr. 723).

At the time of the hearing, plaintiff's daughter was two years old.   Ms. Sweitzer testified

that her husband "comes and goes as he pleases."   (Tr. 727).

Plaintiff stopped working in March, 2008, because her bipolar disorder "got incredibly

bad."   She was unable to function with customers and was having panic attacks.   She had bipolar

disease for years, but it became too much to handle at that point.   (Tr. 729-730).

Ms. Sweitzer testified that her life "is like a roller coaster."   On a typical day, she drags

herself out of bed and takes care of her daughter.   She said she does not sleep well at night, and

she naps a lot during the day.   She lets the housework pile up and only goes out if it is necessary.

She does not see friends and said that she had "totally isolated" herself.   She fought with her

husband all the time.   She had daily crying spells.   (Tr. 730-732).

The ALJ pointed out that a doctor's note from June, 2010, said that she was dropping her

disability claim and was going to look for a part-time job because that would better her chances of

getting custody of her child.    Plaintiff told the ALJ that her husband was "very emotionally

abusive" and was threatening that she would lose custody because of her bipolar disease.   Her

divorce attorney told her that it would be better for her custody case if she dropped her disability

claim and tried to go back to work.   However, she did not drop her claim because she really felt

she could not work.   She said that, over the years, she had numerous attempts and failures at

working and going to college.   (Tr. 725, 732-733).

A vocational expert (VE) also testified.   The ALJ asked him to assume a person who was able to do work at the sedentary to medium exertional levels, but who was limited to very short and simple instructions, and needed close supervision with hourly reminders regarding work tasks. The VE testified that she could not do plaintiff's past work because it was semiskilled.   He noted that she would be limited to unskilled work.   He testified that she would be able to do the jobs of call-out operator (sedentary, unskilled) and finish inspector (light, unskilled), both of which exist in significant numbers in the national and regional economies.   (Tr. 737-739).

The VE also testified that, assuming the limitations set forth by therapist Christina Helms, plaintiff would not be able to do any work.   (Tr. 743-744).   .

**3.     Medical Records**

In July, 2007, Ms. Sweitzer was admitted to Barnes Jewish Hospital in St. Louis, Missouri, with suicidal thoughts.   She was on several medications for bipolar disease.   Her medications were adjusted during a three-day hospital stay.   She was stable on discharge.   (Tr. 307-310).

She received counseling through Chestnut Health Systems in 2007 and 2008.   The record contains periodic treatment plans, but not records of the actual counseling sessions.   In December, 2007, the Axis I diagnoses were major depressive disorder, panic disorder with agoraphobia and generalized anxiety disorder.   (Tr. 380).

Ms. Sweitzer began seeing psychiatrist Randy Jung in June, 2008, at the direction of her therapist.   She was irritable and had a labile mood.   She had racing thoughts and bad bouts of depression off and on.   She was 18 weeks pregnant. Her first mental health treatment had been in junior high school.   She had at least 4 psychiatric hospitalizations.   Her father had Alzheimer's

7

with agitation and psychosis.   She had gotten married in March, 2008, and she and her husband lived with her father.   Dr. Jung diagnosed bipolar disorder vs. major depression, recurrent, moderate, with an Axis II diagnosis of borderline personality disorder.   He prescribed Wellbutrin and psychotherapy.   (Tr. 598-599).   She did somewhat better on Wellbutrin, but had periodic crying spells, irritability and bad moods.   She described multiple marital problems.   She was to start taking Depakote after her baby was born.   (Tr. 594-597).

Plaintiff's daughter was delivered via cesarean section in October, 2008.   (Tr. 549-551).

The next treatment plan at Chestnut was dated November 13, 2008.   The only Axis I diagnosis was generalized anxiety disorder.   Her GAF score was 55.   It was noted that she had significant changes in her life since her previous treatment plan in that she had married and had a child.   She was finding new coping strategies and redefining her goals according to her new lifestyle.   (Tr. 376-377).

Plaintiff was also seen by Dr. Jung on November 13, 2008.   Her mood was better, but she was irritable.   Her speech was rapid, but well organized, and she was cognitively intact.   She was taking Wellbutrin as well as Depakote.   The diagnosis was bipolar disorder, with marital problems.   (Tr. 592-593).   In December, 2008, she reported that she had increased anxiety as her husband had lost thousands of dollars gambling.   (Tr. 591).

In January, 2009, plaintiff underwent emergency surgical repair of a perforated bowel with colostomy.   Dr. Jung saw her during her hospitalization and noted that she denied symptoms of depression or mania.   She was alert and oriented with no objective signs of psychosis or dissociative states.   Insight and judgment were good.   The Axis I diagnosis was bipolar disorder, stable.   Her GAF was 50.   (Tr. 458-464, 490-495).   The colostomy was reversed in March,

2009.   During that surgery, an incidental appendectomy was also performed.   (Tr. 470-476).

In May, 2009, Dr. Jung noted that plaintiff was doing better.   Her mood was better, she was less irritable and her sleep was improved.   However, she said her father was "making me crazy" and he might need assisted living.   She also said that her husband had been laid off and she was losing her insurance.   She was going to switch to Dr. Gilbert at Southern Illinois Healthcare. (Tr. 587-588).

Plaintiff saw Dr. Gilbert on June 25, 2009.   He noted that she recognized that she had some kind of bipolar mood disorder, marital conflicts and concerns over weight gain.   He said that she had "come to the conclusion that she is going to abandon her career in retail sales and apply for disability."   She thought of herself as "very damaged" by her bowel resection and colostomy. (Tr. 607).    On mental status exam, she was alert, oriented and cooperative.   Her moods had been more stable on Depakote and Geodon, but she did not have good energy and she gained weight.   Therefore, Dr. Gilbert substituted Topamax for Depakote.   She was to continue taking Wellbutrin and Geodon.   (Tr. 608).

Christine Hutchison did a mental health assessment at Chestnut on July 9, 2009.   Plaintiff told her that her mood swings had increased in severity and her medication was not helping.   She said her moods were unpredictable and debilitating, and that the extreme highs and lows made it difficult to find a job and made it difficult to be a parent and maintain interpersonal relationships. (Tr. 601).

On July 29, 2009, Dr. Gilbert noted that she had scored in the severe depression range on a depression inventory.   She was in the range of marked anxiety as well.    He questioned whether she had bipolar disease, suggesting that she was experiencing rapid cycling from "extreme

depression to terrible depression." Because she felt that Topamax had given her some mood stability, he increased the dosage. He also increased the dosage of Geodon, and added Pristiq to Wellbutrin. (Tr. 714-715).

On August 8, 2009, plaintiff went to the emergency room at St. Elizabeth's Hospital in Belleville, Illinois, because she was having suicidal thoughts. She was admitted and treated with milieu therapy, drugs, psychotherapy, activities therapy and group therapy. She was discharged on August 11, 2009. At the time of discharge, she had a normal mood and no suicidal thoughts. The diagnosis was bipolar disorder, depressed type, in remission. (Tr. 631-632).

Plaintiff was seen from July, 2009, through December 2009, by Dr. Stephen Burger, a neurologist. He diagnosed sensory peripheral neuropathy in all four limbs. An MRI of the brain was unremarkable. Blood work did not show the cause of her neuropathy. Dr. Burger prescribed Gabapentin (Neurontin). On the last visit, she said she had a modest reduction in paresthesias, so the dosage was increased. She was to return in 6 months. (Tr. 661-677).

Plaintiff was next seen at Southern Illinois Healthcare in January, 2010. Dr. Stacy Neff saw her as Dr. Gilbert was evidently no longer practicing there. Plaintiff said that she had been seeing Dr. Jung for the past 6 months, but could no longer afford him because her insurance changed. She complained that Dr. Gilbert had not offered her hospitalization when she saw him in July, 2009, but she admitted she had not been suicidal then. Dr. Gilbert had scheduled a follow-up appointment for 2 months later, which she felt was too long, so she returned to Dr. Jung.[3] Dr. Neff saw plaintiff 8 times through September, 2010. Dr. Neff first increased her Geodon to try to achieve better mood stabilization, but this caused headaches, so she stopped taking it. She then became more depressed. Dr. Neff adjusted her medications, adding

---

[3] There is no record of plaintiff seeing Dr. Jung between May, 2009, and January, 2010.

Temazepam.   Plaintiff continued to complain of feeling depressed, picking at her skin and arguing with her husband.   Dr. Neff again adjusted her medications and added Abilify.   (Tr. 703-711).

In May, 2010, plaintiff reported that she was feeling better on Abilify and also she had kicked her husband out of the house and was getting a divorce.   She was interacting well with the office staff, and her affect was improved.   She said her mood was better, but not great.   Her thought process was logical and linear, and her insight and judgment were fair.   She did not have any delusions, grandiosity or paranoia.   In June, she reported that she was doing much better. Her medications were continued.   (Tr. 699-702).   By August, 2010, she was back together with her husband.   She reported that her mood was stable and she was not having any acute anxiety. She was considering having another baby, and Dr. Neff discussed the use of her medications during pregnancy.   (Tr. 697-698).   In September, 2010, plaintiff and her husband had broken up again, and she reported anxiety.   Her affect was anxious, with logical and linear thought processes.   Insight and judgment were fair.   The diagnoses were bipolar affective disorder, not otherwise specified, and borderline personality disorder.   Dr. Neff added BuSpar to her current medications.   (Tr. 695-696).

**4.      Physical RFC Assessment**

A state agency consultant assessed plaintiff's physical RFC in August, 2009.   He indicated that plaintiff was able to do light work, but she was limited to only occasional stooping and crouching due to her abdominal surgery.   (Tr. 647-654).

**5.      Opinion of therapist Christina Helm**

Christina Helm (formerly known as Christina Hamilton) completed a form in which she

assessed serious limitations, including poor or no ability to deal with the public, deal with work stresses, function independently, and maintain attention/concentration.   Ms. Helm filled out the form in December, 2010.   (Tr. 720-722).

## Analysis

Plaintiff's first two points are meritorious and require remand.

It is well-settled that the hypothetical question posed to the VE must "orient the VE to the totality of a claimant's limitations" by setting forth all of the claimant's limitations in the question. ***O'Connor-Spinner v. Astrue*, 627 F.3d 614, 691 (7th Cir. 2010), and cases cited therein**.   The obvious reason for the rule is "to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations."   ***Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002).**   The omission of a limitation from the hypothetical may be harmless, however, where the VE learns of the limitation from another source, such as other questioning at the hearing.   ***Ibid*.**

In her written decision, ALJ Reeves found that Ms. Sweitzer was not able to work at a job that required "contact with the general public."   See, Tr. 25.   However, she did not include that limitation in the hypothetical question which she posed to the VE.   See, Tr. 736-739.

After the ALJ finished questioning the VE, plaintiff's counsel asked the VE "what kind of contact would be required in those jobs [call-out operator and finish inspector] with say the public and co-workers and supervisors?"   The VE testified:

> The call out operator the only contact with the public would be – it actually wouldn't be with the public but the only contact would be by phone.   The production work you're sitting beside me and you do get supervision and supervisors come around regularly.   About all I can tell you.   (Tr. 740).

The above statement is the only testimony regarding contact with the public.   The ALJ did

not ask for any clarification or further explanation.   In the Court's view, this brief exchange did not sufficiently inform the VE that plaintiff was limited to having no contact with the general public.

In her decision, ALJ Reeves said that the VE testified that neither of the jobs under discussion requires contact with the general public.   This is an inaccurate view of the testimony.

With regard to the call-out operator job, the VE's testimony distinguished between face-to-face contact and telephone contact.   However, this is a distinction which was not drawn by the ALJ, and nothing in the record suggests that there is any difference in plaintiff's ability to deal with the general public via telephone as opposed to in person.   Further, the Court notes that the DOT does not classify jobs based on whether contact with the public is required.   The issue requires exposition by the VE, which did not occur here.   The DOT provides that a call-out operator "[c]ompiles credit information, such as status of credit accounts, personal references, and bank accounts to fulfill subscribers' requests, using telephone. Copies information onto form to update information for credit record on file, or for computer input. Telephones subscriber to relay requested information or submits data obtained for typewritten report to subscriber." *Dictionary of Occupational Titles*, 237.367-014, 1991 WL 672186.   This description suggests that the job entails significant contact with members of the public, as opposed to co-employees and supervisors.

The VE did not directly address the question of contact with the public with regard to the finish inspector job.   Defendant suggests that any error in this regard is harmless because the job of finish inspector does not, in fact, require contact with the general public based on her reading of the DOT.   That may be true, but the VE's testimony conflicts with the DOT description of both

jobs with regard to plaintiff's ability to follow instructions.

The ALJ asked the VE to assume that plaintiff was limited in her ability to "understand and remember and carry out detailed instructions " and was limited to "very short and simple instructions."   (Tr. 82-83).   The DOT specifies a "reasoning level" for each job.   In her written decision, the ALJ said that plaintiff was limited to "simple one- and two-step instructions.   (Tr. 25).   This corresponds to Reasoning Level 1: "Apply commonsense understanding to carry out simple one- or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job."   *Dictionary of Occupational Titles*, Appendix C, 1991 WL 688702.   However, both of the jobs discussed require a Reasoning Level greater than1.

A call-out operator must function at Reasoning Level 3, meaning that she must "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations." *Dictionary of Occupational Titles,* 237.367-014, 1991 WL 672186.   A finish inspector must function at Reasoning Level 2, meaning that she must "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations."   DOT, 741.687-010, 1991 WL 680249.

The ALJ said that the VE's testimony was consistent with the DOT.   (Tr. 35).   However, neither the ALJ nor plaintiff's counsel asked the VE whether there was any conflict.   An ALJ is required to resolve *apparent* conflicts between the VE's testimony and the DOT.   See **Overman v. Astrue, 546 F.3d 456, 463 (7ᵗʰ Cir. 2008)**.   In the Court's view, the conflict between a limitation to Reasoning Level 1 and a job that requires a higher Reasoning Level is, or should be,

14

apparent to a person who is familiar with DOT job descriptions.

Citing ***Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)**, the Commissioner argues that that ALJ's failure to ask about conflicts with the DOT was harmless because plaintiff has not identified any conflict with regard to the finish inspector job.   According to the DOT, however, the job of finish inspector requires the ability to carry out detailed instructions, and the ALJ found that Ms. Sweitzer was limited in this ability.   The fact of the matter is that the VE's testimony regarding both jobs conflicts with the DOT.   If Ms. Sweitzer is limited in her ability to carry out detailed instructions and is limited to jobs that require no contact with the general public and involve only simple one- and two-step instructions, she cannot perform the jobs of call-out operator or finish inspector as they are described in the DOT.

The Court recognizes the recent case of ***Sawyer v. Colvin*, 2013 WL856509 (7th Cir. 2013)**.   Relying on precedent from the Eighth Circuit, the Seventh Circuit held that a person who is limited to following simple instructions is not necessarily unable to do a job that requires Reasoning Level 3.   That case is distinguishable.   In ***Sawyer***, the plaintiff was limited to "simple tasks."   Here, though, the ALJ's written decision in effect limited Ms. Sweitzer to Reasoning Level 1 in that she was limited to "simple one-and two-step work instructions" and the ALJ found that she was limited in her ability to carry out detailed instructions.   When these limitations are coupled with her inability to have contact with the general public, the VE's testimony that she could work as a call-out operator and as a finish inspector conflicts with the DOT descriptions of those jobs.   Therefore, the ALJ's failure to ask about conflicts with the DOT is not harmless.

The Commissioner bears the burden at step five of the sequential analysis of showing that the claimant can do other work.   ***Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008)**.   The

15

unexplained conflict between the VE's testimony and the DOT means that the ALJ's conclusion that Ms. Sweitzer could do the jobs of call-out operator and finish inspector was not supported by substantial evidence.   *Overman*, **546 F3d at 465**.

Because of the ALJ's errors, this case must be remanded.   The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Sweitzer was disabled during the relevant time period or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

There are only two avenues for remanding a social security case.   Remand can be ordered pursuant to sentence four or to sentence six of 42 U.S.C. § 405(g).   A sentence four remand depends upon a finding of error, and is itself a final, appealable order.   In contrast, a sentence six remand is for the purpose of receipt of new evidence, but does not determine whether the Commissioner's decision as rendered was correct.   A sentence six remand is not an appealable order.   See, *Melkonyan v. Sullivan*, **501 U.S. 89 (1991); Perlman *v. Swiss Bank Corporation Comprehensive Disability Protection Plan*, 195 F.3d 975, 978 (7th Cir. 1999).**   Here, a sentence four remand is appropriate.

<u>**Conclusion**</u>

The Commissioner's final decision denying Deborah Ann Sweitzer's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

DATED:   May 31, 2013.

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**